UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GBF ENGINEERING, INC.,

        Plaintiff,                                 Civil Action No.
                                                     09-CV-11367
vs.

                                                   PAUL D. BORMAN
JOSEPH and CHILLY JOHN,                       UNITED STATES DISTRICT JUDGE

        Defendants.

_____/


## OPINION AND ORDER GRANTING
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

       This is a state law contract case. Plaintiff GBF Engineering, Inc. ("GBF") subleased a parcel

of commercial real estate located in Fort Lauderdale, Florida, to non-party S&J Scrap Metal

("S&J"), which is owned by non-party Sam John ("Sam"). Co-defendants Joseph John ("Joseph")

and Chilly John ("Chilly"), Sam's parents,[1] both entered into an agreement guaranteeing Sam's

performance under the sublease.[2] Sam failed to pay rent in accordance with the terms of the

sublease and vacated the premises in October 2008. GBF sues Joseph and Chilly, the two guarantors

of the sublease, seeking $100,414.80, the amount of unpaid rent plus other costs related to S&J's

---

[1] Joseph and Chilly John are collectively referred to as "Defendants" or "Co-defendants."

[2] A "guaranty" is defined as "[a] promise to answer for the payment of some debt, or the performance of some duty, in case of the failure of another who is liable in the first instance." Black's Law Dictionary 773 (9th ed. 2009).
       Both Defendants testified in their respective depositions that each of them authorized their administrative assistant, Cherie Vallarie, to sign their names on the guaranty. *See* Joseph Dep. at 38, 43; Chilly Dep. at 11

purported abandonment of the premises, plus to-be-determined attorney fees.

GBF now seeks summary judgment on its contract guaranty claim. Defendants, who allege they are both illiterate, claim, among other things, that no enforceable contract exists because there was no "meeting of the minds" with regard to an essential term of the guaranty; namely, the length of the underlying sublease. Oral argument occurred on August 19, 2010. For the reasons that follow, GBF's Motion for Summary Judgment will be granted.

## II. BACKGROUND

### A.

Co-defendant guarantors Joseph and Chilly John are husband and wife. Joseph Dep. at 8. Since 2005, they have owned and operated a Detroit-based scrap metal business called JJ Scrap Metal, Inc. Joseph Dep. at 8-9. Both Defendants were born in the United States and have been actively engaged in business for many years. *Id*. They allege that they are illiterate; they cannot read or write English, and have no formal education. Joseph Dep. at 6-7; Chilly Dep. at 6-7.

The dictionary definition of "illiterate" is "unable" to read and write. Webster's II New Riverside University Dictionary 1988. Defendant Joseph admitted that he can sign his name, and read his name if written on a piece of paper. Joseph Dep. at 8. He testified that he is "very good with numbers . . ." *Id*. at 31.

Defendants do not allege any diagnosed disability. Joseph's deposition evidences audio and visual comprehension -- no evidence of any deficiency in processing information or inability to respond to questioning. Indeed, Joseph's deposition, discussed *infra*, evidences both intelligence and business acumen.

Joseph and Chilly have been working in the scrap metal business for over 25 years and 14 years, respectively. Joseph Dep. at 8; Chilly Dep. at 8. Joseph testified that for the 20 years prior to 2005, he worked for himself freelancing in scrap metal. Joseph Dep. at 9.

**B.**

Sam John operated the scrap metal business at issue in this case, S&J Scrap Metal ("S&J"), formerly located at 999 NW 53rd Street in Fort Lauderdale, Florida. Joseph Dep. at 8, 14-15. The Court hereinafter refers to this property as "the premises."

**C.**

Sam negotiated to rent the premises from Plaintiff GBF Engineering, Inc., with GBF's designated real estate broker, Zak West. *Id*. at 18-20, 27. West reported to Aslan Dilmaghani, a senior project engineer with GBF. Dilmaghani Dep. at 20. Although Joseph spoke to West "once or twice" regarding the pre-rental condition of the premises, he alleges that he was not involved in the process of negotiating the lease; rather, Sam negotiated the lease terms with West. *Id*. at 19-20, 27. According to Joseph, although he and Sam "walked" the proposed premises together with West, he and Sam never discussed the terms of the sub lease. *Id*. at 28. Further, Dilmaghani never spoke with the Johns. Dilmaghani Dep. at 20.

All parties agree that the initial negotiations for the premises involved a one-year lease. On November 25, 2007, West sent an email to Dilmaghani informing him that a potential tenant in the scrap metal business (S&J) was interested in renting the premises, and inquiring as to whether GBF would be willing to rent to a scrap metal business. Resp. Ex. C. Dilmaghani responded affirmatively the next day giving West the green light to show the property. *Id*.

On November 29, 2007, West sent an email to Sam's administrative assistant, setting forth

the rental terms proposed by GBF, including the following term regarding the duration of the proposed sublease:

> The term and the date of this lease agreement can be set for starting date of January 2008 for 12 months To End of December 2008, subject to renew and rent adjustment for January 2009 to December 2009 (One year at the time).

Resp. Ex. D. Hamid Hosseini, the Vice-President of GBF, testified that Dilmaghani mentioned during initial lease discussions that the lease would be for a one-year term and that GBF "wanted to lease the property for one year." Hosseini Dep. at 15-16.

On December 10, 2007, West sent an email to Sam containing a number of documents for signature, one of which was a document entitled "Contract to Lease." Resp. at Exs. F, G.[3] The originally-proposed "Contract to Lease," which is signed by Sam, lists February 1, 2008, and January 31, 2009, as the "proposed" start and ending dates of the sublease, respectively – a one year term. Resp. at Ex. G. On December 15, 2007, West sent Dilmaghani an email with an attachment containing the "Contract to Lease," signed by Sam and reflecting a proposed one-year lease term. Resp. at Ex. I, p. 2. On December 17, 2007, after receiving the Sam-signed "Contract to Lease," Dilmaghani sent West an email stating that he will ask GBF's attorney to draft a sublease agreement. Resp. at Ex. I, p. 1.

Four days later, on December 21, 2007, West sent an email to Sam containing a proposed sublease agreement for his signature, and a proposed sublease guaranty for the signature of Joseph and Chilly. Resp. at Ex. J. The actual proposed sublease agreement reflected a two-year lease term going through 2010; every iteration of the sublease agreement, from the initial proposal through the final adopted sublease, contained the two-year period. Resp. at Ex. K. The originally drafted

---

[3] The "Contract to Lease" mistakenly lists JJ Scrap Metal, Inc., Joseph and Chilly's scrap metal business, as the prospective tenant instead of Sam's business, S&J.

sublease agreement reflected a two-year term beginning on January 1, 2008, and ending on December 31, 2009. However, at some point before the contract was executed, these dates were crossed-out, and beginning and ending dates of February 1, 2008, and January 31, 2009, respectively, were written in. The beginning and ending dates of the sublease agreement were moved by one month per the request of Sam, who advised GBF that he wanted to make repairs to the premises before moving in. Resp. at Ex. H. In any event, the lease term reflected in every sublease agreement was for a period of two-years – both as originally drafted and as subsequently revised.

Sam initialed next to both date changes, evidencing that he was well aware of the dates, and the term. The only change in the sublease agreement was in the start and end dates; the two year term was a constant in every iteration of the sublease. Sam's request to extend the contract length occurred because he wanted to make repairs to the premises and protect against a rent increase in a second year.

Significantly, with regard to the major issue in this case, on December 21, 2007, weeks before the sublease and the guaranty were signed by Sam, and Joseph and Chilly, respectively, copies of the two-year sublease agreement and the guaranty were emailed to Sam, as well as to Joseph and Chilly, via their administrative assistant, Cheri Vallarie, at JJ Scrap Metal:

> Dear Cheri:
> Attached please find the following documents:
> 1. Sublease, for signature by Sam John and/or Joe John, duly authorized.
> 2. Sublease Guaranty, for signature by Joe John and Sam John and their spouses, if any.

Defs.' Resp. Ex. J.

The parties executed the sublease agreement on January 31, 2008. GBF Ex. A. Notably,

more than five weeks passed between the time when Sam was first emailed a copy of the proposed two-year sublease agreement on December 21, 2007, and the execution of the sublease agreement on January 31, 2008. The record does not reflect that Sam objected to the two-year lease term at any time during this five week period. Sam initialed next to both the revised starting date of the sublease and the revised ending date of the sublease. *Id*.; Sam Decl. ¶ 7, Resp. at Ex. T. A copy of the fully executed sublease agreement was handed to Sam on February 4, 2008, four days after it was executed. *See* GBF Ex. Q.

Despite having initialed next to the handwritten date changes contained in the sublease agreement, which contained the two-year sublease term, Sam testified that he and West agreed that the sublease would be for a term of one-year, and that he did not notice, when he signed and initialed the two-year sublease, that it was written for a two-year lease period:

> 3.  Zak West and I agreed that I was going to lease the property for a one year period starting on February 1, 2008.

> \* \* \* \*

> 5.  When Mr. West sent the Sublease Agreement to me, I noticed that the start date was for January 1, 2008. I told Mr. West that the start date was wrong and he said he would cross out the start date and the end date, put in the right dates, and we would all initial it.

> 6.  I did not notice that the attorney had made the sublease for two years, and that Mr. West did not correct the error.

> 7.  I initialed the change in date believing that I was signing a one-year sublease.

Sam Decl. ¶¶ 3, 5-7, Resp. at Ex. T.

Sam testified that he noticed the start date was wrong in the original version of the sublease and that he mentioned the error to West. West then changed the dates by crossing-out the old dates and writing in new ones. Yet, knowing that there had been an issue involving erroneous dates in the

originally-drafted sublease agreement, Sam alleges that he did not ensure the accuracy of the handwritten revisions to the sublease before initialing next to the changes and executing the revised sublease agreement containing the two-year term. There is no evidence in the record that Sam is illiterate. Most importantly, it bears reiterating that the sublease agreement contained the two-year lease term in every iteration – both before and after the handwritten revisions. The handwritten revisions only shifted the start and end dates forward by one month.

In addition, Sam had been provided a copy of the proposed sublease agreement, which reflected a two-year term, on December 21, 2007, more than five weeks before the sublease was executed on January 31, 2008. Sam was also handed a copy of the executed sublease agreement on February 4, 2008, four days after it was executed. Neither Sam nor his parents objected to any part of the agreement – until much, much later. Both the proposed sublease agreement and the executed sublease agreement contain a two-year lease term. Yet, at no time before, or immediately after, execution did Sam, or Defendants Joseph and Chilly John object to the two-year length of the sublease; they did not object until Sam had exited the premises prior to the termination of even one year on the two-year sublease.

Dilmaghani testified that Sam requested a two-year lease term before entering into the sublease agreement:

> Q:      Was there more than one conversation regarding a two-year lease?
>
> A:      Again, I don't recall, it's like two years ago, but I know prior to them getting into a contract, they said they wanted a two-year lease.

Dilmaghani Dep. at 55. According to Hosseini, Sam requested the two-year lease in order to avoid a possible rent increase at the end of the first year:

> Q:      Why is it now a two-year lease, if you know?

A:     Because the condition was to increase the rent after one year if they decide to renew, but basically . . . if they can sign a two-year lease . . . [,] they locked the same price without increasing.

Hosseini Dep. at 19.

Among numerous other things, the sublease agreement required S&J to pay rent by the first day of each month, continuously use the space for "light industrial storage and office space," and maintain the premises in "good condition." GBF Ex. A, ¶¶ 3.01, 5.01, 9.01. The sublease also discusses liability in the event of default:

In case of any event of default or breach by Sublessee, . . . Sublessee shall also be liable for . . . brokers' fees incurred by Sublessor in connection with reletting the whole or any part of the Premises; the costs of removing and storing Sublessee's . . . property; the costs of repairing, altering, remodeling or otherwise putting the Premises into condition acceptable to a new Sublessee or Sublessees, and all reasonable expenses incurred by Sublessor in enforcing or defending Sublessor's rights and/or remedies including reasonable attorney's fees.

GBF Ex. A, ¶ 20.02(9). Moreover, the sublease agreement contains the following provision: "This Sublease may not be altered, changed or amended except by an instrument in writing signed by both parties hereto." *Id.* at ¶ 42.01(e).

### D.

The sublease guaranty was executed by Joseph and Chilly on the same day as the sublease agreement itself, on January 31, 2008. GBF Ex. B. The circumstances under which Joseph and Chilly executed the guaranty are as follows. During the sublease negotiation process, West called JJ Scrap Metal, Inc., Joseph and Chilly's scrap metal business, and spoke to Joseph's administrative assistant, Cherie Vallarie. Joseph Dep. at 27-28, 37. West requested, as a condition to subleasing the property to Sam, that Joseph and Chilly sign a sublease guaranty under which the two would guarantee the performance of Sam under the lease agreement. *Id.* Because he is allegedly illiterate,

Joseph told his administrative assistant/secretary, Vallarie, who is literate, "to go ahead and sign [his] name and sign [his] wife's name" to the sublease guaranty. *Id*. at 28, 44. Joseph and Chilly both testified that Vallarie had authority to sign their names to a document guaranteeing the performance of Sam under a sublease that they thought would be for a one year term. Joseph Dep. at 38, 43; Chilly Dep. at 11. Joseph alleges that he did not have anyone review the document on his behalf before directing Vallarie to sign his name to it. Joseph Dep. at 43. Joseph alleges that his understanding was that by having his secretary sign his and his wife's names to the sublease guaranty, he and his wife were guaranteeing their son's performance under a one-year sublease agreement, not a two-year sublease agreement. *Id*. at 27-28.

The guaranty that Vallarie signed for Joseph and Chilly does not specify the duration of the sublease; it states that Joseph and Chilly are guaranteeing their son's performance under the terms of the sublease agreement, without specifying any sublease terms. The Court again sets forth the guaranty, in pertinent part:

> FOR VALUE RECEIVED, and in consideration for and as an inducement to GBF Engineering, Inc. a Florida Company, as SUBLESSOR to SUBLEASE the PREMISES referred to in the annexed SUBLEASE dated January 31, 2008 (the "SUBLEASE") to S&J Scrap Metal, Inc., a Michigan Company, as SUBLESSEE; the undersigned, Sam John . . . and Joseph John and Chilly John, Husband and Wife, (collectively referred herein as "Guarantors"), subject to receiving prompt written notice of any default by SUBLESSEE for which performance is required hereunder, does hereby guaranty to SUBLESSOR the punctual payment of the Rent and other charges (hereinafter collectively called "RENTS") and the due performance of all the other terms, covenants and conditions contained in said SUBLEASE on this part of the SUBLESSEE under said SUBLEASE. The undersigned does hereby covenant and agree to pay to the SUBLESSOR in each and every instance such sum or sums of money as the SUBLESSEE is and shall become liable for and/or obligated to pay under said SUBLEASE and /or fully to satisfy and perform such other terms, covenants and conditions of said SUBLEASE on the part of the SUBLESSEE . . . .

GBF Ex. B. Additionally, the guaranty states: "This Guaranty or any of the provisions hereof cannot

be modified, waived or terminated, unless in writing, signed by the parties hereto." *Id*. The sublease guaranty is signed by Sam, Joseph, and Chilly, and dated January 31, 2008.

### E.

On February 1, 2008, the day after the parties executed both the sublease agreement and the sublease guaranty, West added a handwritten note in his file stating: "Ok with 2 years initial lease term requested by tenants, in view of improvements proposed by them at their expense." Resp. at Ex. O. This note states that the two-year term was "requested by tenants," thereby suggesting that the two-year lease term was Sam's idea and not GBF's. Sam, however, maintains that it was always his intention to enter into a one-year sublease. Sam Decl. ¶¶ 3, 5-7, Resp. at Ex. T.

### F.

S&J operated its business until October 2008, at which time it closed its doors, stopped paying rent, and evacuated the premises. This was about nine months into the two-year sublease period. Joseph testified that S&J shut down because it was not profitable. Joseph Dep. at 55. S&J made its last rent payment by check dated October 7, 2008. *See* Mot. Ex. E (copies of all rent checks received by GBF). Thus, S&J made only nine out of a total of 24 rent payments due under the two-year sublease, leaving 15 months unpaid.

S&J's office manager, Ashley Roldan, contacted GBF's human resources administrator, Amanda Goodwin, in September or October 2008 to inquire as to how much time was left on the sublease. Goodwin Dep. at 5. Goodwin informed Roldan that more than a year remained. *Id*. at 6. Roldan then indicated that she thought the sublease was for one year; Goodwin responded that the sublease was for two years, at which time the conversation ended. *Id*.

Roldan testified that she delivered to GBF the keys to the premises at the end of October

2008. Roldan Decl. ¶ 9. Roldan further testified that she thought S&J had permission to vacate the premises early based on conversations she had with Goodwin. *Id*. ¶ 12. Goodwin, on the other hand, testified that she never received the keys from Roldan, and that Roldan never mentioned that S&J was vacating the premises. Goodwin Dep. at 6-7, 17-18. Additionally, Hosseini testified that S&J never dropped off the keys and that, in fact, he had to use a spare key to access the premises after S&J vacated. Hosseini Dep. at 8, 30.

On November 14, 2008, GBF sent a certified letter to Sam demanding that he pay November's rent in accordance with the terms of the sublease. *See* GBF Ex. J. GBF's attorney also sent Sam a demand letter on March 23, 2009, outlining various amounts due and demanding that he perform his obligations under the sublease. *See* GBF Ex. K.

## G.

GBF filed its Motion for Summary Judgment on April 5, 2010, seeking a money judgment against Joseph and Chilly, jointly and severally, in the amount of $100,414.80, broken down as follows:

- $87,450 in unpaid rent ($5,830 per month for 15 months);
- $3,273 in environmental testing and remediation costs, *see* GBF Exs. G, H;
- $6,639 in cleanup charges, *see* GBF Ex. I;
- $3,052.80 in brokers' fees, *see* GBF Exs. F, M.

In addition, GBF seeks attorney fees.

## III. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(b), a party against whom a claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the

nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-323. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce evidence of evidentiary quality" demonstrating

the existence of a material fact.  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).

## IV.  ANALYSIS

### A.  The Parties' Arguments, Generally

GBF contends that the signed guaranty clearly and unambiguously obligates Joseph and Chilly to pay all amounts due under the sublease.  GBF argues that S&J defaulted under the sublease by abandoning the premises and failing to pay rent after October 2008 (month nine of the two-year sublease).  Citing case law for the proposition that failure to read a contract before signing is not a valid defense to enforcement, GBF contends that "[w]hether or not Defendants read the Guaranty or had a third party review the Guaranty for them prior to execution is irrelevant" because they had a duty to examine the contract and understand its terms before signing it.  GBF Br. at 7.

In its response brief, Defendants advance four arguments in support of their position that summary judgment in favor of GBF is inappropriate.  First, Defendants contend that there was no "meeting of the minds" with regard to an essential element of the guaranty and the underlying sublease agreement—the length of the sublease—and thus the guaranty is unenforceable for lack of mutual assent.

Second, Defendants argue that Joseph's secretary, who signed the guaranty on behalf of Joseph and Chilly, exceeded her authority by signing a document guaranteeing Sam's performance under a two-year sublease when Joseph authorized his secretary to sign a document guaranteeing only a one-year sublease.

Third, Defendants argue that they are entitled to the equitable remedies of rescission and/or reformation because the execution of the two-year sublease guaranty was the result of mistake,

misrepresentation, or fraud.  According to Defendants,

> [e]quitable relief is appropriate . . . because Defendants signed the Sublease Guarantee under the mistaken belief that they were guaranteeing a one year sublease.  Likewise, their son, Sam John, signed the Sublease Agreement under the mistaken belief that he was entering into a one year sublease.

Resp. at 11-12.


Fourth, citing waiver and estoppel principles, Defendants argue that GBF waived its right to collect unpaid rent from Defendants because GBF "allowed S&J to vacate the premises, an action inconsistent with the right [it is now] attempting to assert" in this lawsuit.  Resp. at 15-16.

### B.  Preliminary Matters

Before discussing Defendants' four arguments, the Court first addresses two preliminary matters – the first involves choice of law; the second involves the proper application of the parol evidence rule.

### 1.  Choice of Law

On July 14, 2010, the parties submitted a stipulation stating that they agree that Michigan law is applicable to this action.  *See* docket entries 25 and 26.  Therefore, the Court applies Michigan law.

### 2.  Parol Evidence Rule

The parties disagree with regard to the proper application of the parol evidence rule in this case.  GBF claims that extrinsic evidence—including statements made by West before the closing regarding the duration of the sublease—is not admissible because the sublease agreement itself sets forth the duration of the sublease.  Defendants, on the other hand, argue that parol evidence is admissible because the sublease agreement and guaranty do not contain integration clauses.

The parol evidence rule

> prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing.

> For purposes of the rule, "extrinsic evidence" includes any evidence that seeks to prove an agreement or understanding arising out of the parties' words or conduct spoken or engaged in prior to or contemporaneous with the execution of the final, fully integrated written agreement. Such evidence . . . may not be used to explain, vary, supplement, or contradict unambiguous language appearing in the contract.

11 Richard A. Lord, *Williston on Contracts* § 33:1, pp. 541, 550–551 (4th ed. 1999) (footnote omitted).

Parol evidence is admissible to show that the execution of a contract was procured by fraud.

*See Match v. Hunt*, 38 Mich. 1, 3 (1878) ("[t]he right to impeach the transaction by parol on the ground of fraud is unquestionable"). As stated by Professor Williston,

> [s]ince the application of the parol evidence rule depends on the existence of a valid integrated contract, the rule does not preclude evidence which contradicts the very existence or validity of an alleged contractual obligation. Thus, the rule permits the admission of facts that negate mutuality of assent, such as duress or fraud . . .

11 Richard A. Lord, *Williston on Contracts* § 33:14, pp. 614-615 (footnote omitted). The reason for this important exception was explained by the Michigan Supreme Court:

> It is practically a universal rule that in suits to reform written instruments on the ground of fraud or mutual mistake, parol evidence is always admissible to establish the fact of fraud or of a mistake and in what it consisted, and to show how the writing should be corrected in order to conform to the agreement or intention which the parties actually made or had. This doctrine impinges on and limits the salutary rule of law against the admission of parol evidence to vary a written contract, but experience has clearly shown this to be necessary; otherwise a rule adopted by the courts as a protection against fraud and false swearing would, as was said in regard to the analogous rule known as the statute of frauds, become the instrument of the very fraud it was intended to prevent. Evidence of fraud or mistake is seldom found in the

> instrument itself, from which it follows that unless parol evidence may be
> admitted for that purpose, the aggrieved party would have as little hope of
> redress in a court of equity as in a court of law.

*Goldberg v. Cities Service Oil Co.*, 275 Mich. 199, 209 (1936).

The parol evidence rule does not bar West's pre-closing statements because the main thrust of Defendants' defense in the present case is that they were induced to enter into a two-year guaranty agreement by fraud and that there was a lack of mutual assent. As such, parol evidence of the parties' prior statements made during the negotiation stage of the transaction is admissible for the purpose of establishing these defenses. *See* 11 Richard A. Lord, *Williston on Contracts* § 33:14, p. 615 ("the [parol evidence] rule permits the admission of facts that negate mutuality of assent, such as duress or fraud").[4]

### C. Discussion of Defendants' Arguments

The Court now addresses the four arguments asserted by Defendants in support of their argument that summary judgment in favor of GBF is improper.

### 1. Mutual Assent

As stated by the Michigan Supreme Court long ago:

> In construing a contract of guaranty the intention of the parties should

---

[4] The Court notes, as do Defendants, that there is no express integration clause contained in the sublease agreement or the guaranty. "Recitations to the effect that a written contract is integrated, that all conditions, promises, or representations are contained in the writing and that the parties are not to be bound except by the writing, are commonly known as merger or integration clauses." 11 Richard A. Lord, *Williston on Contracts* § 33:1, p. 661.

Because there is no express integration clause contained in the sublease agreement or the guaranty, the parties dispute whether the contracts were intended to be final statements of the agreement between them. However, the Court need not resolve this issue because, either way, parol evidence is admissible. If the parties did not intend the contracts to be final statements of their agreement, the parol evidence rule does not apply. If the parties did intend the contracts to be integrated agreements, the *Match/Goldberg* exception to the parol evidence rule is operative, allowing for the consideration of extrinsic evidence.

govern. Where the language of the writing is not ambiguous the construction is a question of law for the court, on a consideration of the entire instrument. But where the meaning of the language is obscure or susceptible of more than one interpretation, and it is necessary to determine the intention of the parties by reading the contract with reference to extrinsic facts, the construction is for the jury if the extrinsic facts are in dispute. If they are not in dispute, the question is for the court.

*Griffin Mfg. Co. v. Mitshkun*, 233 Mich. 640, 642 (1926). *See also Morris & Co. v. Lucker*, 158 Mich. 518, 520 (1909) ("[c]ontracts of guaranty are to be construed like other contracts, and the intent of the parties as collected from the whole instrument and the subject-matter to which it applies is to govern").

Defendants argue that there is a question of fact as to whether the guaranty is a valid contract because there was no "meeting of the minds," or mutual assent, with regard to an essential term of the contract – the length of the underlying sublease. According to Defendants, they were "at all times . . . led to believe that they were guaranteeing a one year sublease, and Sam John believed that he was executing a one year sublease." Resp. at 9-10.

In support of their statement that they were "led to believe that they were guaranteeing a one year sublease," Defendants cite the deposition testimony of Joseph, who testified that West requested that Defendants guarantee Sam's performance under a one-year sublease and mentioned nothing about the need for a two-year guarantee. Joseph Dep. at 27-28. Defendants also contend that the proposed duration of the sublease mysteriously changed from one-year to two years inasmuch as there was purportedly a "lack of any communication to Sam John or the Defendants regarding the change of this essential term" and "absolutely no written discussions regarding a change from a one-year sublease to a two-year sublease until Mr. West [sic] handwritten note appears on February 1, 2008, *after* Sam John had signed the Sublease Agreement." Resp. at 9 (emphasis in original).

GBF, on the other hand, argues that there is no fact question that the sublease contained a two-year term and that Sam assented to such a term when he initialed next to the beginning and ending dates of the sublease agreement. GBF also states that there is no fact question that Joseph and Chilly "authorized their signatures on the Guaranty which unambiguously guaranteed payment of the Sublease." Reply at 1. GBF cites Michigan law for the proposition that "failure to read an agreement is not a valid defense to enforcement of a contract" and "[a] contracting party has a duty to examine a contract and know what the party has signed." *See Montgomery v. Fid. & Guar. Life Ins. Co.*, 269 Mich. App. 126, 130 (2005).

As stated by Professor Williston,

> [t]he assent necessary in order to form a[] . . . contract is operative only to the extent that it is outwardly, objectively manifested. Whether there is mutual assent to the terms of a contract is determined by an objective test, rather than the subjective intentions of the parties. In order to create a legal obligation by way of a contract, it is the parties' objective manifestations, not their secret intentions, that determine whether mutual assent is present. Without such assent there can be no contract.

1 Richard A. Lord, *Williston on Contracts* § 3:4, pp. 283-284 (4th ed. 2007) (footnotes omitted). Thus, "while it is often said that the goal of interpretation of a written document is to seek the intent of the parties, that intent must be measured by their outward manifestations." *Id*. at p. 297.

In the present case, there can be no doubt that Sam assented to a two-year sublease term. He argues now, long after the fact, that he always intended a one-year sublease; however, the record is undisputed that Sam initialed next to both the starting date (February 1, 2008) and the ending date (January 31, 2010) of the sublease term, thereby objectively manifesting his intent to enter into a two-year sublease.

In addition, Sam was emailed a copy of the two-year sublease agreement on December 21, 2007, more than five weeks before the document was executed. West also handed Sam a copy of

the executed sublease on February 4, 2008, four days after the sublease was executed. Never during this extended period of time did Sam raise an objection to the duration of the sublease, and there is no evidence that GBF was trying to mislead Sam in any manner as to the length of the sublease.

That Sam may not have subjectively meant to enter into a two-year sublease, even if true, is irrelevant because it is his "objective manifestations" (i.e., initialing next to the start and end dates of the sublease)—and not his "secret intentions"—that matter to determine whether mutual assent is present. The sublease agreement is a valid contract, supported by mutual assent.

Defendants also argue that the guaranty is unenforceable for lack of mutual assent. Defendants reason that they did not know they were entering into a contract to guarantee Sam's performance under a two-year sublease; rather, they were led to believe they were guaranteeing Sam's performance under a one-year sublease because West stated, at some point in the negotiation process, that GBF required a one-year guaranty and mentioned nothing about a two-year guaranty.

This argument implicates potential fraud issues, a topic that will be discussed below. For now, the Court notes that,

> [i]n the absence of fraud, one who signs a written agreement is bound by its terms whether or not he or she can read. A person unable to read is still bound by contracts which he or she signs and which are otherwise valid and enforceable. A party's mere ignorance, occasioned by his or her limited intelligence and understanding of the language and of the contents of the contract which he or she voluntarily executes, is not, in the absence of fraud, a ground for avoiding it, although it is different from what he or she supposed.

17A Corpus Juris Secundum § 152 *Contracts* (2010) (footnotes omitted). *See also* 1 Richard A. Lord, *Williston on Contracts* § 4:19, pp. 588-590 ("when one is ignorant of the language in which a document is written, or who is illiterate, executes a writing proposed as a contract under a mistake as to its contents[,] . . . . [s]uch a person is bound, in the absence of fraud, if the person does not

require the document to be read to him" (footnotes omitted)); *Rossi v. Douglas*, 203 Md. 190, 199 (Md. 1953) ("in the absence of [fraud, duress, or mutual mistake], one having the capacity to understand a written document who reads it, or, without reading it or having it read to him, signs it, is bound by his signature. . . . This is everywhere the rule" (citations omitted) (quoted with approval by Williston, *see* 27 Richard A. Lord, *Williston on Contracts* § 70:113, p. 563 (4th ed. 2003))). "This rule, though frequently harsh in application, rests upon the fundamental need for security in business transactions; the integrity of contracts demands that it be rigidly enforced by the courts." 1 Richard A. Lord, *Williston on Contracts* § 4.19, at pp. 595-596.

Here, it is undisputed that Defendants voluntarily authorized their agent to sign their names to the sublease guaranty. There is no evidence that Defendants asked for the guaranty to be read aloud to them. Thus, to the extent Defendants argue that the contract is unenforceable because they did not read it and/or understand its terms, the argument is unpersuasive.

### 2. The Authority of Defendants' Secretary

Cherie Vallarie, Joseph's secretary, signed the sublease guaranty on behalf of Joseph and Chilly. Joseph and Chilly both admit that they authorized Vallarie to sign the guaranty on their behalf, but argue that Vallarie exceeded her authority when she signed a document that bound them to guarantee Sam's performance under a two-year sublease instead of a one-year sublease.

This argument amounts to an unpersuasive attempt by Defendants to shift the blame from themselves to Vallarie. The law is clear that Defendants, though allegedly illiterate, had an obligation to know and understand their obligations under the guaranty by having the document read aloud to them before signing it. Vallarie, Defendants' secretary, who is literate, would have presumably been available to assist with this, had she been asked. As stated by the Eighth Circuit more than a hundred years ago:

A written contract . . . cannot be annulled or avoided by proof that one of the parties of it, who was sound in mind and able in body, could not read or write, did not know the terms of the agreement, and neglected to ask any one to read it to him when he signed it. A written contract is the highest evidence of the terms of an agreement between the parties to it, and it is the duty of every contracting party to learn and know its contents before he signs and delivers it. He owes this duty to the other party to the contract, because the latter may and probably will, pay his money and shape his action in reliance upon the agreement. He owes it to the public, which, as a matter of public policy, treats the written contract as a conclusive answer to the question, what was the agreement? . . . . If [one] cannot read [his contract], it is as much his duty to procure some reliable person to read and explain it to him, before he signs it, as it would be to read it before he signed it if he were able to do so; and his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents. This is a just and salutary rule, because the other contracting party universally acts and changes his position on the faith of the contract; and it would be a gross fraud upon him to permit one, who has received the benefits of the agreement in silence, to escape from its burdens by proof that he did not know and did not inquire what these burdens were, when he assumed them.

*Chicago, St. P., M. & O. Ry. Co. v. Belliwith*, 83 F. 437, 440-441 (8th Cir. 1897). This passage rings true today and, in the absence of fraud, which is discussed below, forecloses Defendants' argument that their agent exceeded her authority when she signed the guaranty on behalf of Defendants pursuant to their instruction.

### 3. Mistake

Defendants argue that they are entitled to the equitable remedies of rescission and/or reformation because the execution of the sublease guaranty was the result of a mistake, either unilateral or mutual: "Equitable relief is appropriate herein because Defendants signed the Sublease Guarantee under the mistaken belief that they were guaranteeing a one year sublease." Resp. at 11-12. Mistake is not a viable defense here.

"A mutual mistake will give rise to a voidable contract when both parties, at the time of contracting, share a misconception about a basic assumption or vital fact upon which they base their

bargain, and neither party has expressly or impliedly undertaken the risk of the mistake." 1 Richard A. Lord, *Williston on Contracts* § 3:4, p. 287. Here, Defendants present no evidence of any mistake on the part of GBF regarding the intended duration of the sublease. In fact, it is clear that GBF, at the time the sublease agreement and guaranty were executed, intended a two-year sublease. Thus, mutual mistake is not a possible defense here.

Moreover,

> a party is permitted to rescind an agreement based upon its unilateral mistake when: [1] enforcement of the agreement would be unconscionable (i.e., due to fraud, duress, undue influence, etc.); [2] the mistake is material or relates to the substance of the consideration; [3] the mistake occurred regardless of the exercise of ordinary care by the party in error; [4] and it is possible to place both parties in their *status quo ante*.

27 Richard A. Lord, *Williston on Contracts* § 70.104, p. 521 (emphasis in original). With regard to the third element of this framework, "[c]ontract law contemplates that an aggrieved party's mistake not be the result of inadvertence that could have been avoided had ordinary care been exercised." *Id*. at p. 520.

Here, Defendants cannot satisfy the third element because the purported mistake would not have occurred had Defendants exercised ordinary care by taking steps to fully understand their obligations under the guaranty, which are unambiguously written in the terms of sublease guaranty and the underlying sublease agreement. *See id.* ("[t]he authority of a court to review contracts is limited . . . to effectuate the parties' intent as evidenced by the contract terms"). "The illiteracy of a party will not excuse him or her from the duty of learning the contents of a written contract, as by having it read to him or her." 17A Corpus Juris Secundum § 152 *Contracts* (2010). Further, as noted *supra* on page 2, illiteracy means an inability to read and write; it does not indicate a disability or lack of intelligence.

The deposition interplay between Joseph and defense counsel indicates Joseph's robust command of the English language, an ability to understand questions, analyze issues, and to respond relevantly and forcefully. His deposition also evidences that Joseph took an active part in the negotiations of the sublease:

> Q: Have you taken any medication today which would impair your ability to testify?
>
> A. None. You want a blood test?

Joseph Dep. at 11.

> Q: What were the circumstances under which you spoke to Mr. West?
>
> A: When my son leased the property off of him, he wanted *us* -- because the place was a pig pen, okay. It had piss, and I mean people crapped on the floors and went all over the place, and my son wanted to remodel it before he moves in. And he met my son down there *and me* and he went and showed him the place. He told him *we* were going to put -- my son was going to . . . put new asphalt in. . . .
>
> Q: So you talked to Mr. West during negotiations for the sublease?
>
> A: Right. My son was sublease -- doing negotiations with him on leasing the property.
>
> Q: And part of what *you* talked about with Mr. West were improvements that your son wanted to make to the property?
>
> A: Correct.
>
> * * * *
>
> A: I had hardly any discussion with Mr. West. You know, we was walking around the building and *we* were just pointing out -- my son was pointing out with him what he was meaning to have done to the building.

Joseph Dep. 19-20 (emphasis added). Clearly, Defendants had the intellectual wherewithal to have exercised the "ordinary care" that would have uncovered their claimed "mistake."

### 4. Fraud & Misrepresentation

The elements of fraud are:

- [1] a false material assertion by the person alleged to have committed fraud

- [2] scienter, sometimes described as knowledge of the falsity of the assertion complained of, or a high degree of disregard for whether the assertion was correct

- [3] the intention of the person making the assertion to induce the plaintiff to act or refrain from acting, or as is sometimes said, to induce the reliance of the person to whom the representation was made

- [4] justifiable reliance on the assertion by the person to whom it was made

- [5] damage to the plaintiff

26 Richard A. Lord, *Williston on Contracts* § 69:3, pp. 495-497 (4th ed. 2003). Critically, under Michigan law,

> a failure to read a written contract document does not require rescission of the contract unless other facts indicate fraud, artifice, or deception. *See, for example, Vandendries v. General Motors Corp.*, 130 Mich. App. 195, 200, 343 N.W.2d 4 (1983). Failure to read a contract document provides a ground for rescission only where the failure [to read] was not induced by carelessness alone, but instead was induced by some stratagem, trick, or artifice by the parties seeking to enforce the contract. *Otto Baedeker & Associates, Inc. v. Hamtramck State Bank*, 257 Mich. 435, 441, 241 N.W. 249 (1932).

*Moffit v. Sederlund*, 145 Mich. App. 1, 8 (1985).

At the same time, Michigan courts seem to afford illiterate persons extra protection under certain circumstances. For example, in *Molski v. Molski*, 44 Mich. App. 15, 17 (1973) (per curiam), a case on which Defendants rely, a 77-year-old woman who could neither read nor write English, and had difficulty speaking it, sought rescission of a land sale contract, the exact terms of which she

was unaware despite having signed the contract. *Id*. at 17-18. The Court of Appeals refused to disturb the trial court's decision to grant rescission, stating:

> An examination of the trial record reveals that the question of incapacity to contract and of mistake and misunderstanding basically turned upon the credibility and appearance of the witnesses. The trial judge had an opportunity to hear and observe the witnesses. Consequently, this Court will not, in the absence of manifest injustice, supplant its judgment for that of the trial court.

> * * * *

> Here the trial court heard a 77-year-old woman, obviously illiterate, state that she did not understand what she was signing or what the terms of the agreement were. The trial judge was in the best position to determine who was telling the truth. His decision was not against the weight of the evidence.

*Id*. at 18-19. The facts in the instant case establish an intelligent, long-time businessman.

Defendants contend that

> the one year Contract to Lease mysteriously became a two-year Sublease Guarantee without any conversation or notification that [GBF] had changed the length of the lease. The confusion was compounded when Zak West told [Joseph] that he needed to sign a guarantee on a one year sublease.

Resp. at 12. The precise facts relative to this allegation are as follows:

1. It is undisputed that the parties began their negotiations by discussing a one-year sublease. Dilmaghani and Hosseini both assert that, later in the negotiation process, Sam requested a two-year sublease (in order to avoid a rent increase at the end of the first year), which is why an agreement was drawn up for a two-year term. Sam, on the other hand, maintains that he and West "agreed that [the property would be leased] for a one year period."

2. West spoke to either Joseph or Joseph's secretary and "wanted [Joseph's] signature and [Chilly's] signature on a lease . . . for a one-year lease, not a two-year lease, a one-year lease." Joseph Dep. at 27-28. It is unclear from the record when in the negotiation process this conversation took place. What is clear is that the statement was made by West while the parties were negotiating, before closing.

3. On December 10, 2007, West sent an email to Sam containing a proposed

"Contract to Lease," which contained a one-year lease term.

4.    On December 21, 2007, West sent an email to Sam containing a proposed two-year sublease agreement, and a proposed guaranty agreement. Sam later assented to the two-year sublease term by initialing next to the starting and ending dates.

5.    Closing on the sublease agreement and guaranty did not occur until January 31, 2008, more than five weeks after West sent a copy of the proposed two-year sublease and guaranty to Sam for review.

Defendants contend that the contract "mysteriously became a two-year Sublease Guarantee without any conversation or notification that [GBF] had changed the length of the lease" in between December 10, 2007, and December 21, 2007. GBF asserts that Sam requested the two-year sublease; Defendants assert that Sam never requested a two-year sublease.

On the one hand, GBF is correct in contending that Defendants' fraud argument is foreclosed by *Moffit*. Under *Moffit*, the failure to read/understand a contract is only a defense if the actual failure to read/understand "was not induced by carelessness alone, but instead was induced by some stratagem, trick, or artifice." *Moffit*, 145 Mich. App. at 8.

Defendants had ample opportunity to learn the contents of the guaranty and the underlying two-year sublease agreement before agreeing to guarantee Sam's performance under the terms of the sublease. The evidence is undisputed that copies of the proposed sublease agreement and guaranty were emailed to Sam (via his secretary) more than five weeks before their execution. The sublease agreement, both as originally drafted and as subsequently revised at closing (via the handwritten date changes), contained a two-year term. In addition, a copy of the executed sublease agreement was given to Sam shortly after the document was executed on January 31, 2008. As discussed above, Defendants could have required that the documents be read aloud to them at any time during the five week period preceding closing. Because there is no allegation in this case that GBF tricked Defendants into not taking appropriate steps to understand their obligations under the

26

guaranty agreement, and because Defendants had sufficient time before closing to take such steps, *Moffit* forecloses their fraud claim. *See Moffit*, 145 Mich. App. at 9 ("Defendants assert fraud, but do not assert that any fraud induced them to execute the deed without reading it completely").[5]

In addition, executed copies of the two-year sublease and the guaranty were sent to Sam a few weeks after closing. Defendants, who received copies of the proposed guaranty and underlying two-year sublease agreement prior to the closing, *see* Defs.' Resp. Ex. J, did not object until more the six months later, after the closing and their signing of the guaranty

Defendants' contend that their position is supported by *Molski*, a case in which the Michigan Court of Appeals afforded leeway to an illiterate contracting party. Notably, however, *Molski* is not a fraud case, and the illiterate plaintiff in *Molski* was a 77-year-old lady who not only could not read or write English, but could sparsely speak it. Moreover, *Molski* involved a question as to whether the plaintiff had the capacity to contract. Conversely, Joseph and Chilly were approximately 52 and 44 years old at the time of closing, *see* Joseph Dep. at 6; Chilly Dep. at 6, were born in the United States, and are experienced business operators; not at all akin to *Molski*. In addition, it is important

_____

[5] Defendants argue that they were tricked into signing the guaranty because West had previously told Joseph or his secretary, at some unknown point during the negotiations process, that all that was necessary was a one-year guaranty. Defendants rely on *Lamhoff v. Daniel*, 256 Mich. 333 (1931), in support of their argument. There, the plaintiff sought specific performance of a lease agreement after inducing his landlord to enter into the agreement by misrepresenting the ending date of the landlord's lease agreement with another tenant. Critically, the landlord had lost his copy of the lease with the other tenant and was therefore justifiably reliant on the plaintiff's representations.

Conversely, in the present case, West emailed a copy of the guaranty and the two-year sublease agreement to Sam, and to Joseph and Chilly, via their administrative assistant, more than five weeks before closing. Thus, the Johns had ample opportunity to familiarize themselves with the agreement before closing, and any reliance on West's prior statements, made during the ongoing negotiation process, was not justified under the circumstances. *See* 26 Richard A. Lord, *Williston on Contracts* § 69:3, pp. 495-497 (requiring "justifiable reliance" as an element of fraud).

to note that the plaintiff in *Molski* presumably had no means by which to examine and understand the land sale contract whereas Joseph and Chilly had at their disposal a literate secretary, who signed the guaranty on their behalf, and their son, Sam, both of whom could have presumably read the sublease guaranty and underlying sublease agreement aloud to Defendants to ensure their understanding of their legal obligations.

In addition, Joseph's testimony reflects that he took an active part in his son Sam's decision to sublease the premises: He testified that he spoke to West on one or two occasions during negotiations, Joseph Dep. at 19-20, that Joseph examined the premises with his son and West, *id*. at 19, and that Joseph talked to West about improvements that Sam wanted to make to the premises. *Id*. at 20. Thus, Joseph appears to have been a "helicopter" parent in this sublease/guaranty transaction – not a distant, know-nothing signer of the guaranty. Further, Sam, who appears by testimony to have had his father along in selecting the premises at issue, knew that Joseph would be executing a guaranty. *Id*. at 28. Thus, Sam and Joseph were involved in this process together. Finally, Chilly testified that she has continuously worked with her husband in the scrap business. Chilly Dep. at 7-8.

For all these reasons, Defendants cannot show they were induced to enter into the sublease guaranty by fraud. Accordingly, they are not entitled to the equitable remedies of rescission or reformation.

In sum, the record is undisputed that Defendants, albeit allegedly illiterate,[6] (a) are

---

[6] It is interesting to note the following testimony of Joseph John:

Q:     This is a March 23rd, 2009, demand letter addressed to S&J Scrap Metal, and in the second correspondence, addressed to Sam John, Joe John, and Chilly John.

experienced business people of sound mind and (b) could have asked that the guaranty and underlying sublease be read aloud to them by their administrative assistant or their son. After all, the two-year sublease agreement and guaranty were emailed to their son, Sam, more than five weeks before closing, giving Sam and Defendants more than ample time to familiarize themselves with the contracts, both of which are unambiguously written with regard to the length of the sublease.[7] Moreover, the term as to which the alleged mistake was made—the ending date of the sublease—was not a complex or even nuanced term that required any degree of sophistication to understand. Further, as noted before at page 2, Joseph testified that he is very good with numbers. Joseph Dep. at 31.

The guaranty states, in pertinent part:

> The undersigned does hereby further consent to any subsequent change, modification and/or amendment of said SUBLEASE, any of its terms, covenants or conditions, or in the RENTS payable thereunder, . . . to any renewals or extensions thereof . . . all of which may be made without notice to or consent of the undersigned and without in any manner releasing or relieving the undersigned from liability under this Guaranty.

GBF Ex. B.

These facts place this case outside the ambit of *Lamhoff* and *Molski*. Defendants had an

---

A.    I never seen it, sir.

Q:    Is it your testimony you've never seen this before?

A:    No sir. I've never seen it. Then again, I don't **READ** all my mail. You guys get paid for being smart, you and this guy, okay. Guys like us, we just work hard for a living. That's all.

Joseph Dep. at 57-58 (emphasis added). Apparently Joseph John can read, at least some of his mail.

[7] The guaranty guarantees payment under the underlying sublease, whatever its terms, and the sublease, in turn, unequivocally specifies a two-year term.

obligation under the law to understand the terms of the agreement into which they entered by having the agreement read aloud to them. Had they done this, they would have been well aware that they were guaranteeing a two-year sublease. They did not ask anyone to read the agreement aloud despite the fact that they had a literate administrative assistant at their disposal. Defendants cannot put their hands over their eyes and cover their ears when they execute business agreements. The Court notes Joseph's testimony of his involvement in forming his business JJ Scrap Metal in 2005. Joseph testified that he founded JJ Scrap Metal with the state of Michigan and signed a paper. Joseph Dep. at 47. Joseph's business sophistication is evident from his deposition, which reflects that he was astute enough to understand the term "d/b/a" and "S corporation":

> A:    No, didn't have a license. Didn't have no – just d/b/a, doing business
>        as Joe John.

* * * *

> Q:    But JJ Scrap Metal is a corporate entity?

> A:    It's an S corporated (sic) company, sir.

> Q:    And who did the S corp, who created it?

> A:    I did.

*Id*. at 11, 48.

The evidence is clear that West's statement about the requirement for a one-year sublease guaranty was made during the rolling negotiation process; there is no evidence that the statement was untrue when made, or evidence of any intent to deceive. Further, it is clear that when the time came to draw up the sublease, the parties had agreed to a two-year sublease; a one-year period was not in any drafts of the sublease, much less the final sublease.

### 5.  Waiver & Estoppel

Finally, Defendants argue that GBF voluntarily allowed them to vacate the premises early, thereby waiving their right to collect unpaid rent by virtue of this lawsuit. GBF does not agree and argues that there are no facts supporting Defendants' position that GBF accepted a surrender of the premises.

There is a fact question as to whether S&J returned the keys to GBF after vacating the premises.[8] However, the issue is not material. Even crediting Defendants' version of the events and assuming that S&J did return the keys to GBF, as the Court must do in taking the facts in the light most favorable to the non-moving party for the purposes of the present motion, Defendants' waiver and estoppel argument is unpersuasive. "Surrender of a lease involves more than mere abandonment of the premises by the tenant; it requires a mutual agreement between landlord and tenant to terminate the lease." *M&V Barocas v. THC, Inc.*, 216 Mich. App. 447, 450 (1996). *See also Pyle v. Orzell*, 350 Mich. 298, 303 (1957) ("[i]n Michigan in order to show the surrender of a lease . . . mutual agreement must be shown. Mere vacating or abandonment of the premises does not of itself act to exonerate the tenant or operate as a surrender; mutual agreement to terminate the original lease must also be made out") (citations omitted). Here, regardless of whether Defendants turned in the keys, there is no evidence that Defendants entered into an agreement with GBF to terminate the sublease. None of the Johns—neither Sam, Joseph, or Chilly—ever sent a written communication to GBF stating an intention to terminate the lease and/or guaranty.

## V. CONCLUSION AND ORDER

For the reasons stated, GBF's Motion for Summary Judgment is granted against Defendants

---

[8] Roldan testified that she returned the keys to GBF at the end of October 2008. Roldan Decl. ¶ 9. Goodwin and Hosseini both testified to the contrary. Goodwin Dep. 17-18; Hosseini Dep. at 8, 30.

Joseph and Chilly John. Within 14 days of today's date, GBF shall submit a bill of costs, detailing those costs to which it believes it is entitled under the terms of the guaranty and underlying sublease agreement. If Defendants wish to be heard with regard to GBF's bill of costs, they may file a response within 14 days of the date on which the bill of costs is filed.

        SO ORDERED.


                                             s/Paul D. Borman
                                             PAUL D. BORMAN
                                             UNITED STATES DISTRICT JUDGE

Dated: August 25, 2010




CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on August 25, 2010.


                                             s/Denise Goodine
                                             Case Manager